Good morning. May it please the Court, my name is Matthew Green. I represent the appellant in this case, Efrain Mendoza-Sandoval, who is not present and in the custody of the Bureau of Prisons serving a sentence of 104 months. I would like to reserve three minutes for rebuttal. Mr. Mendoza-Sandoval's conviction should be reversed and the case should be remanded for a new trial because the district court deprived him of a proper official restraint jury instruction. Although this Court has considered the doctrine of official restraint in a variety of contexts, the facts of this case most closely parallel those of U.S. v. Bayo Bahena decided by this Court in 2005, 41 F. 3rd, 1083. In Bayo Bahena, a Border Patrol agent operating what was referred to as a night scope observed a group of people heading north in a desolate area near the U.S.-Mexico border. In this case, a Border Patrol agent operating something called the remote video surveillance system camera observed a group traveling northwest in a rural and desolate area again near the U.S.-Mexico border. In each case, the camera or the scope operator agent communicated by radio with other Border Patrol agents while continuing to observe and constantly observe the respective groups with the surveillance equipment. Likewise, in each case, the surveilling Border Patrol agent led the other Border Patrol agents to the defendants who were subsequently apprehended. In neither case was there testimony that the defendants were seen prior to the camera or the scope operator's initial visual contact inside the border, and in both cases, the record established that the defendants could have been observed by the government's personnel using the government's surveillance equipment crossing the border. So what are the facts that you think were so – you're basically talking about whether you should have gotten an instruction. Yes. And what are the facts that you think support that, that it was possible to observe them because of the camera? Well, Your Honor, again, the reason why not only was it possible, but the record establishes through the camera operator's testimony, Agent Matthew Kowecki, that it was most likely possible and probable that other groups were seen crossing the border that day. Okay. Now, the reason why that is significant is because, again, in Bayo Bahena, the facts were that there was initial visual contact by a Border Patrol agent using surveillance equipment. And the record was absolutely silent. There was no evidence, no testimony whatsoever that that particular Border Patrol agent who was – had initial contact using surveillance saw the defendant while he was crossing. The only thing that was ultimately the most significant item to the Court in that case was that a reasonable inference to that could have been drawn. In this case, there are even more facts. But in – in Bayo Bahena, did the agent say that he didn't see him? No. The agent said nothing. The record was just silent. All right. But here he said, I didn't see him until you picked him up to a – to a – two miles north of the border. Right. Well, in – in Bayo Bahena, there was testimony not of the actual sighting agent. Okay. The – the surveilling agent did not testify apparently at trial. In this case, the camera operator did testify. What the Bayo Bahena court said was that even though there was no evidence whatsoever of potential sighting, the reasonable inference could have been drawn. In this case, the reason why there is that reasonable inference is laid out specifically in Agent Kawecki's testimony. However – however, in Vela Robles, our 2005 case, we say, must be in the visual or physical grasp of the authorities at all times to show that he or she was under official restraint. Reading this record, which I tried to read as best I could, there is no evidence to suggest that anybody was in the visual or physical grasp of authorities until the officer suggests that he saw them, and at that point, he suggests what he did. I mean, there is no evidence in this record to suggest anybody else saw them. Well, Your Honor, if I may. Where is the evidence? The evidence is, I would respectfully submit, is at least as substantial, if not more, than the evidence in Bayo Bahena. And here's why. There is – there was no evidence whatsoever, none, that the camera operator in Bayo Bahena ever saw the defendant until he was a quarter to a half mile within the United States border. That's Bayo Bahena. But Castellanos-Garcia suggests that the fact that as many as 15 agents may have seen the defendant cross the border, and this is may have, is not enough to get the instruction. Mere conjecture is not enough. That's what it says right in that case. 270, Fed Third. And, Your Honor, in Bayo Bahena, the Court went out of its way to distinguish the facts in the Bayo Bahena case from the facts in the Castellanos case. In the Bayo Bahena case, what the Court says, while distinguishing that, is that there is a claim of constant surveillance or, excuse me, the claim of constant  In the Castellanos-Garcia case, the evidence suggested the defendant was not under any form of surveillance prior to apprehension. That's ultimately what the Castellanos-Garcia case said. What is the surveillance here? Is the surveillance that he was under surveillance or that there was surveillance of the border? Your Honor, if I can try to put this in what I think is the more appropriate context, this is not. There's two forms of official restraint cases that this Court has decided. There's Rule 29 in verdict cases, and then there's theory of the defense in jury instruction cases. And in no way, shape, or form are we, is the appellant arguing today that this evidence is necessarily strong enough to overcome a Rule 29 motion or to prevail. All we are saying is that there was, at the very least, enough evidence supported in the record and to warrant a jury instruction. And counsel, let me go ahead. Kagan. You didn't answer Judge Schroeder's question. You didn't. Her question was very, I was going to say, answer her question. Okay. And you wanted to know what the evidence is. Is that right, Your Honor? I want to know whether he was subject to surveillance or whether he, the area was, the border was subject to surveillance and he could have been under surveillance. The area was subject to surveillance and he could have been subject to surveillance, just like the defendant in bail became. But you would say about that that that's a piece of evidence. Yes. And the question is, is that enough? The fact that he could have been under, enough to get you an instruction. I think that it is enough standing by itself, but there is substantially more than that in this case. And I'm happy to inform the court of that. Okay. What else is it? It will be helpful to me to know what else. Please. Thank you. I mean, the honest truth is, we're here, aren't we, on an abuse of discretion standard? Correct. And so we've got a district court who has these cases in front of him. He's trying to make these situations. The best I found in the record is he might have been. That it was possible to be. Your Honor. Which is, I mean, now we're talking about abuse of discretion and whether to give this jury instruction. So we've looked at one piece of evidence. What else is there? Sure. Your Honor, there's testimony that in a, just like in Bayo Bahena, the agent's proximity to the border and the powerfulness of the camera, no problem seeing people coming across. Although the camera, again, although the camera's three miles from the border, you can see people waving across in Mexico. The camera was one of 29 cameras that make up this remote video surveillance system. Each is operating 24 hours a day, seven days a week. Agent, the most important testimony comes in the exhibits, excerpts of record at 131, when Agent Kawecki concedes that up to three other camera operators may have been working the night that the defendant was observed and arrested. There's up to four camera operators at any given time, including potentially at that night. Now, as Your Honor mentioned, I submit that is evidence, that is affirmative evidence. It was elicited on the record. Agent Kawecki also testified that he and other NACO camera operators have personally seen through that camera undocumented immigrants crossing over the border. But the most important piece of testimony is when Agent Kawecki admitted that it is not only that it's possible that the RVS system, remote video surveillance system, could have captured images of undocumented aliens crossing the border on that night. But that they probably did. But the difference, it seems to me, between this and Bailo-Bahena is that Bailo-Bahena, the person who actually first picked them up, we don't know. It never said, I only saw them at that point. He did not testify. Correct. Nobody ever said that he picked them up at that point. But in this instance, the person who picked them up and caused them to be – who caused them to be picked up says that's the first time I saw them. That's correct. And so if – presumably, if anybody else had seen them earlier, they would have reported them to be picked up, no? Well, Your Honor, again, I think that would be problematic in – in – Why? from a burden of proof standpoint. Because what we have is affirmative evidence, not only that the remote video surveillance system is operated by up to four other people. We have affirmative evidence in the form of Kowiecki's testimony as well that three other people could have been – Okay. Right. I think we do understand what the gist of your argument is. Do you want to touch on any of your other points? Because you have about a minute before you asked for time to reserve. Your Honor, actually, I – this is really the primary point that I did want to touch on. But what I would ask the Court to consider is, again, the case law about theory of defense that has been well, well established in this – in this Court for many years, not only is it cited in Baio-Bahena, but also in Cruz-Escoto, and that is a defendant is entitled to instruction if the theory of the case – if the theory is legally sound and the evidence that makes it applicable – or that makes it applicable even if the evidence is weak, insufficient, inconsistent, and of doubtful credibility. That – that is important. I have one question, which I think the answer to is obvious, but I just want to be sure. You're not claiming that the fact that the cameras were – could have seen these people makes a difference if nobody saw it? No. I am not claiming that. It's just that there – the government has failed to prove beyond and to the exclusion of every reasonable doubt that one of those other three people did not see my client crossing the border. Okay. Thank you. May it please the Court. I'm Chris Cavanias from the District of Arizona. I think the Court's questions have demonstrated that it's hit the nail on the head in terms of the issue. I mean, it really is – it was not an abuse of discretion for Judge Berry to decline to give the instruction in this particular. Oh, I take it he could have given it. I'm sorry? Are you suggesting that he – he had the discretion to have given it? He had the discretion to have given it, although I think, you know, his own words demonstrate that he thought – and I'll quote him – there's no evidence other than mere speculation that Mr. Mendoza was seen at any time before a point about two miles north of the border. And that's – and that's the reality. That much is true in Bello-Bahena as well, no? I'm sorry? That much is also true in Bello-Bahena. Well, you know, judging from what this Court described about Bello-Bahena, which – Bahena, excuse me – which was not addressed in our answering brief, and if I need to file a letter on that, I will, the defendant relied mostly on Cruz Escoto below. And so today, you know, he's relying on this Bello case. But based on the descriptions that both of you gave, it does sound distinguishable in terms of its facts. Because we do have evidence from Agent Kawecki, which said the first time I saw this guy was two and a half miles north of the border, and that's the only evidence we have of any prior sight of this individual. And that's significant, because we can't have a rule – and I guess if we break the defendant's argument down to brass tacks, the rule would be because there's any camera that's trained on the border, and because there may be operators who may be seeing him cross the border at whatever time, we're not sure, and what day, we're not sure, that that would then make this person under constant surveillance. And that's exactly what the district court said. It would be totally illogical to have that rule at ER-235, because then every person crossing the border would be under surveillance. And that's not the rule. Ginsburg. The district court obviously apparently believed the testimony that he was not seen until he was across the border. Yes. I mean, that's the finding. And that's where the room for discretion would be. If there was any doubt about that, he might have given an instruction. And I think that if we review that, that's a factual finding made at ER-235. But that doesn't make sense, does it? Excuse me? The district court, I was about to say the opposite, actually. The district court doesn't get to make a determination about whether the person who said he saw him two and a half miles north of the border was telling the truth. It's not that, Your Honor. It's the district court's statement that there's a complete absence of contrary, that there's no, there's absolutely no evidence on the record to suggest that he may have been seen crossing the border. Suppose somebody didn't believe the two and a half, the person who said I only saw him two and a half miles and thinks he saw him earlier. Well, there's no evidence to support that anybody saw him earlier. I think that's the problem the district court had here, because you may recall from the record the district court the night before, I believe, was kind of pondering whether to give this. And then the government asked the district court to reserve judgment on whether it would give this instruction so that law could be provided. And the Castellanos-Garcia case is right on point where this Court, in terms of the general notion, free-floating speculation is just not enough. And that's what we have here. Sotomayor, you can't, you can't, you can't say that there's evidence that he was seen just on the basis of somebody who said he wasn't. Well, we don't even have to. When all, when the only evidence in the record is that he wasn't, is that what you're saying? Yeah. I mean, if the only evidence in the record is I saw him two and a half miles north of the border and there's absolutely no evidence that anybody saw him before that, then what you have here is there's just no free-floating speculation. And that's what the district court ruled here, frankly. And, you know, the Cruz-Escoto case that was relied on so strongly by the defendant below just really actually supports the district court if you take a look at that case. On that issue, does the Court have any more questions? I don't, I don't believe so. Then with that, I don't, I'm just going to look here, see if there's anything I can add. I do have one question, which is kind of a little off to the side, which is in all of these cases we struggle with this question of surveillance and where, whether the person was seen crossing the border. But in this instance, you very clearly did not allege an attempt to enter. And I don't understand why you set the cases up that way in general. I understand that you have to prove specific intent to prove an attempt to enter, but I don't understand why this case went up in a very easy attempt to enter and there was no reason to get into all this. Well, you know, I think maybe because he was found, I can't speak for the charging AUSA or our office in that context. It's not in the record. I know, but it's not just in this case. It's more general. He was here two and a half miles north. So, I mean, I think that, you know, and he's discovered two and a half miles inside the United States. I think that's, I mean, my, again, I'm speaking off my head here, but that would be a rational reason why he's charged with illegal entry. He was, in fact, here two and a half miles north. With that, then I guess I'll just rely on the answering brief and for any of the other arguments you make. Thank you. Thank you. Thank you. I think it's important to remember that ultimately what all of the precedent holds and what this body of law holds is that, again, the rule is that official restraint is the burden of the government to prove beyond a reasonable doubt that the defendant is free from official restraint. Again, I am not arguing, we are not arguing that this should have been a judgment of acquittal and it was strong enough. We're just arguing that Mr. Mendoza Sandoval was, at the very least, entitled to advance his theory of the defense and that there was, at the very least, that scintilla of evidence, which really seems to be the test that was laid out by the Castellanos Court, Castellanos-Garcia Court, and, again, referenced in Bayo Vajena's subsequent case. So you really want a bright-line rule that if there's evidence that he could have been seen, that the jury is entitled to instruction and that that's sufficient to find that he was seen? I think that is the bright-line rule that Bayo Vajena lays out already. So were there any other questions the Court had for me? I don't believe so. Thank you. Thank you. The case just argued is submitted for decision.
judges: Schroeder, Berzon, Smith